UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

THERNELL SMITH,

                         Plaintiff,

v.                                                                          9:03-CV-0955
                                                                            (LEK/GHL)
JOHN BURGE, Superintendent; JOHN ROURKE,
Captain; WILLIAM CHILSON, Sgt.; D. MYERS,
C.O.; T. CHRISTOPHER, Sgt.,

                         Defendants.

_____

APPEARANCES:                                              OF COUNSEL:

THERNELL SMITH, 90-A-9292
  Plaintiff, *Pro Se*
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13024

HON. ELLIOT L. SPITZER                               PATRICK F. MACRAE, ESQ.
Attorney General of the State of New York        Assistant Attorney General
  Counsel for Defendants
615 Erie Boulevard West, Suite 102
Syracuse, New York 13204-2465

GEORGE H. LOWE, United States Magistrate Judge[1]

## REPORT-RECOMMENDATION

          This matter has been referred to me for Report and Recommendation by the Honorable

Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

N.D.N.Y. 72.3(c).  In this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Inmate

_____

[1]          I would like to thank my extern, Jason Kane, currently a second-year law student
at Syracuse University College of Law, who assisted in the researching and writing of this
Report-Recommendation.

Smith ("Plaintiff") alleges that five employees of the Auburn Correctional Facility–Superintendent John Burge, Captain John Rourke, Sergeant Timothy Christopher, Sergeant William Chilson, and Corrections Officer D. Myers (collectively "Defendants")--violated his rights under the Eighth and Fourteenth Amendments by intentionally depriving him of various property, placing him on a restricted prison diet, and depriving him procedural due process during an eight-day period in March of 2003.  (Dkt. No. 1.)

More specifically, liberally construed, Plaintiff's Complaint contains two groups of factual allegations: (1) that from 6:15 p.m. on March 20, 2003, to 3:15 p.m. on March 21, 2003, Defendants Rourke, Christopher, Chilson and Myers--after transferring Plaintiff to a cold cell--deprived Plaintiff of various property (including pants and a sweatshirt) without issuing a deprivation order, causing Plaintiff to suffer a cold; and (2) that from dinnertime on March 21, 2003, to March 28, 2003, Defendants Burge, Rourke and Chilson--in response to a minor disciplinary infraction--placed Plaintiff on a pre-hearing restricted diet (consisting of an apple and "a hard loaf of bread"), without serving him with a deprivation order or misbehavior report. (*Id*. at ¶¶ 10-15.)

Currently before the Court is Plaintiff's motion for summary judgment (Dkt. No 17), and Defendants' cross-motion for summary judgment (Dkt. No. 16).  Generally, Plaintiff's motion and Defendants' cross-motion raise the same five issues: (1) whether Plaintiff has established an Eighth Amendment claim with respect to the alleged deprivation of property; (2) whether Plaintiff has established a Fourteenth Amendment claim with respect to the alleged deprivation of property; (3) whether Plaintiff has established an Eighth Amendment claim with respect to his placement on a restricted diet; (4) whether Plaintiff has established a Fourteenth Amendment

claim with respect to his placement on a restricted diet; and (5) whether Plaintiff has established the personal involvement of Defendant Burge in any of the alleged constitutional deprivations. (*Compare* Dkt. No. 16 [Defs.' Mem. of Law] *with* Dkt. No. 17, Part 3 [Plf.'s Mem. of Law].)

For the reasons discussed below, I answer each of these questions in the negative. As a result, I recommend that Plaintiff's motion for summary judgment be denied, and that Defendants' cross-motion for summary judgment be granted.

## I.    SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to

---

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

3

the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis*, 00 Civ. 0275, 2004 WL 1125177, *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings and papers, and a civil rights plaintiff's pleadings and papers. *See Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460,  467 (S.D.N.Y. 1998) (*pro se* civil rights action), *aff'd in part*, *vacated in part on other grounds*, 205 F.3d 1324 (2d Cir. 2000) (unpublished decision).  For example, where a civil rights plaintiff is proceeding *pro se*, and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir. 2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (motion for summary judgment in civil rights case).

However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, . . . [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.*, No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).  In other

words,  "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to

survive a motion for summary judgment." *Bussa v. Aitalia Line Aeree Italiane S.p.A.*, 02-CV-

10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord*, *Durran v.

Selsky*, 251 F. Supp.2d 1208, 1211 (W.D.N.Y. 2003) [citations omitted].

Moreover, "there are circumstances where an overly litigious inmate, who is quite

familiar with the legal system and with pleading requirements, may not be afforded such special

solicitude." *Davidson v. Talbot*, 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *19 & n.10

(N.D.N.Y. March 31, 2005) (Treece, M.J.) (plaintiff had filed 20 lawsuits in the Northern District

alone); *Gill v. Riddick*, 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 & n.3 (N.D.N.Y. March

31, 2005) (Treece, M.J.) (plaintiff had filed 20 lawsuits in Northern District alone).[3]  I note that,

in such cases, the overly litigious inmate is not subjected to a heightened pleading requirement,

only denied the leniency normally afforded *pro se* litigants and civil rights litigants.

---

[3]     *See also Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir. 1994) (declining to afford a
*pro se* civil rights inmate the sort of lenient treatment normally afforded *pro se* civil rights
litigants, because the inmate was "an extremely litigious inmate who is quite familiar with the
legal system and with pleading requirements," who at one point had at least 30 simultaneously
pending lawsuits); *Johnson v. Eggersdorf*, 97-CV-0938, Report-Recommendation, at 1, n.1
(N.D.N.Y. Apr. 28, 1999) (Smith, M.J.) (denying leniency to *pro se* civil rights inmate who at
one point had 12 simultaneously pending lawsuits in Northern District), *adopted*, 97-CV-0938,
Decision and Order (N.D.N.Y.  May 28, 1999) (Kahn, J.), *aff'd*, No. 99-0174, 8 Fed. Appx. 140
(2d Cir. May 17, 2001) (unpublished opinion); *Santiago v. C.O. Campisi*, 91 F. Supp.2d 665, 670
(S.D.N.Y. 2000) (applying *Davidson* to *pro se* civil rights inmate who had 10 suits pending in
district); *Brown v. Selsky*, 93-CV-0268, 1995 U.S. Dist. LEXIS 213, at *2, n.1 (W.D.N.Y. Jan.
10, 1995) (denying leniency to *pro se* civil rights inmate who had seven cases pending in
district); *but see McFadden v. Goord*, 04-CV-0799, 2006 WL 681237, at *1, n.3 (N.D.N.Y.
March 14, 2006) (Kahn. J.) (refusing to deny leniency to *pro se* civil rights inmate, despite fact
that he had seven cases pending in other districts in mid-1990s).

Here, Plaintiff has filed five other lawsuits, at least one of which is currently still pending.[4]  I find that these circumstances are not sufficient to deny Plaintiff the leniency normally afforded *pro se* litigants and civil rights litigants.

## II.    STATEMENT OF MATERIAL FACTS

The facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record[5] and are not specifically controverted by the non-movant.[6]  A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[7]  In the event the district court

---

[4]    Specifically, these cases are the following:

1. *Smith v. Yando*, 99-CV-0061, N.D.N.Y., filed 6/93, still pending (McAvoy, J.).
2. *Smith v. Marcellus*, 93-CV-0423, W.D.N.Y., filed 5/93, dismissed 3/95.
3. *Smith v. Goord*, 03-CV-0465, N.D.N.Y., filed 4/03, transferred to W.D.N.Y.
4. *Smith v. Goord*, 03-CV-1111, N.D.N.Y., filed 9/03, transferred to W.D.N.Y.
5. *Smith v. New York*, N.Y. Ct. Cl., filed 7/03.

(*See* Dkt. No. 1 at 11-12.)

[5]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243-245 (2d Cir. 2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented. . . . [I]n determining whether the moving party has met this burden . . . , the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g.*, *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3).  Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

[6]    *See* Local Rule 7.1(a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.").

[7]    *See Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an

chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[8]

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge."[9]  An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[10]  In addition, such an affidavit (or verified complaint) must not be

_____

obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

[8]      *See Patterson v. County of Oneida*, 375 F.2d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the . . . affidavits . . . show that there is no genuine issue as to any material fact . . . .").

[9]      Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) [citations omitted], *cert. denied sub nom*, *Ferrante v. U.S.*, 516 U.S. 806 (1995).

[10]      *See Patterson*, 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'. . . [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon

conclusory.[11]  An affidavit (or verified complaint) is conclusory if, for example, its assertions

lack any supporting evidence or are too general.[12]

Finally, even where an affidavit (or verified complaint) is based on personal knowledge

and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely

unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to

---

information and belief . . . .  Because there is no way to ascertain which portions of [Defendant's]
affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is
insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top
Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (rejecting affidavit made on "suspicion . . . rumor
and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 664 (W.D.N.Y. 1992) (rejecting
affidavit made on "secondhand information and hearsay"), *aff'd*, 995 F. 2d 1147 (2d Cir. 1993).

[11]      *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts
showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 (2d. Cir. 2004) ("Nor
is a genuine issue created merely by the presentation of assertions [in an affidavit] that are
conclusory.") [citations omitted]; *Applegate*, 425 F.2d at 97 (stating that the purpose of Rule
56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from
degenerating into mere elaboration of conclusory pleadings").

[12]      *See, e.g.*, *Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) (McAvoy,
C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition
testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are
insufficient to defeat a properly supported motion for summary judgment.") [citations omitted];
*West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting
affidavit's conclusory statements that, in essence, asserted merely that there was a dispute
between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759
F.2d 989, 997 (2d Cir. 1985) (plaintiff's allegation that she "heard disparaging remarks about
Jews, but, of course, don't ask me to pinpoint people, times or places. . . .  It's all around us" was
conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied*, 474 U.S.
829 (1985); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit]
with the characters and plot line for a novel of intrigue rather than the concrete particulars which
would entitle him to a trial.").

credit the allegations made in the complaint."[13]

Here, the following material facts are supported by evidence in the record and are not specifically controverted:

1.      At the time of the incidents alleged in Plaintiff's Complaint, Plaintiff was a long-term resident of the Auburn C.F. Special Housing Unit (SHU), having been continuously housed in SHU since December 4, 2000.[14]

---

[13]      *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554-555 (2d Cir. 2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner*, 03-CV-3789, 2006 WL 357824, at *3-4 & n.7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.*, 332 F. Supp.2d 599, 612 (S.D.N.Y. 2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd*, 136 Fed. Appx. 383 (2d Cir. 2005) (unreported decision).

[14]      (Dkt. No. 16, ¶ 1 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. A ["Inmate Disciplinary History"]; Dkt. No. 21, Part 1, ¶ 1 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

9

**Events of March 20, 2003**

2.      On March 20, 2003, Plaintiff was transferred from cell number "SHU F-3" to cell

number "SHU E-6."[15]  At approximately 6:15 p.m., after completing a shower, Plaintiff was told

by Sgt. Christopher that he would be moved to another cell.[16]  Sgt. Christopher and/or C.O.

Myers escorted Plaintiff to cell number "SHU E-6" while Plaintiff was wearing a T-shirt and

underwear.[17]  The gallery windows were open, and Plaintiff was cold.[18]

3.      At some point between 9:00 p.m. and 10:00 p.m., C.O. Myers and Sgt.

Christopher brought Plaintiff's property to Plaintiff's new cell.[19]  However, Sgt. Christopher

withheld Plaintiff's property from him, stating (in sum or substance), "You refused to follow

---

[15]      (Dkt. No. 16, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. B ["Internal Movement History"]; Dkt. No. 21, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

[16]      (Dkt. No. 17, Part 2, ¶ 4 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Complaint]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

[17]      (Dkt. No. 17, Part 2, ¶ 4 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

[18]      (Dkt. No. 17, Part 2, ¶ 5 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Compl.; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

[19]      (Dkt. No. 17, Part 2, ¶ 4 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Compl.; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. C [Auburn C.F. Memorandum dated 3/29/03 from Sgt. Christopher to Lt. Estabrook; *cf.* Dkt. No. 16, ¶ 3 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

procedures [regarding the turning on of the cell light]."[20]

### Events of March 21, 2003

4.      On March 21, 2003, at approximately 7:30 a.m., a facility nurse visited Plaintiff

and gave him Sudafed for sinus congestion.[21]  At approximately this time, Sgt. Chilson (who had

been escorting the nurse during her sick call rounds) encountered Plaintiff, who told him that Sgt.

Christopher had deprived Plaintiff of his property.[22]  Specifically, Plaintiff argued that "I never

refused to turn on the light."[23]  Sgt. Chilson told Plaintiff that he would not return the property

until he had discussed the matter with Sgt. Christopher (to determine if a deprivation order had

---

[20]      (Dkt. No. 17, Part 2, ¶ 5 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. C [Auburn C.F. Memorandum dated 3/29/03 from Sgt. Christopher to Lt. Estabrook]; Dkt. No. 16, ¶ 3 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

[21]      (Dkt. No. 16, ¶ 4 [Defs.' Rule 7.1 Statement]; Dkt. No. 21, Part 1, ¶ 4 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Lt. Estabrook]; Dkt. No. 16, Ex. N [Plf.'s medical record, dated 3/21/03]; Dkt. No. 21, Part 1, ¶ 5 [Plf.'s Aff. in Opp. to Defs.' Cross-Motion for Summ. Judg., admitting fact that he received Sudafed on 3/21/03]; Dkt. No. 21, Part 1, ¶¶ 5, 7 [ Plf.'s Aff. in Supp. of Opp. to Defs.' Cross-Motion for Summ. Judg., admitting fact that he received Sudafed from nurse during morning of 3/21/03].)

[22]      (Dkt. No. 17, Part 2, ¶ 7 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 12 [Plf.'s Verified Compl.]; Dkt. No. 21, Part 1, Plf.'s Aff. in Supp. of Opp. to Defs.' Cross-Motion for Summ. Judg., ¶ 7; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Captain Rourke]; cf. Dkt. No. 16, ¶ 4 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

[23]      (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03, in which he states, in part, that when he spoke to Sgt. Chilson on the morning of 3/21, "I then informed Sgt. Chilson[] that I never refused to turn on the light, or take my personal or State property."].)

been issued or was being issued).[24]  Sgt. Chilson believed that he would have an opportunity to

talk to Sgt. Christopher when Sgt. Christopher relieved him at about 3:00 p.m.[25]

     5.       At some point between 8:00 a.m. and 8:45 a.m., Capt. Rourke encountered

Plaintiff while making his rounds.[26]  Plaintiff told Captain Rourke about the events of the

previous evening.[27]  He also told Capt. Rourke that he was cold and would appreciate it if

someone brought him his property.[28]  Capt. Rourke told Plaintiff that he would have a corrections

officer bring Plaintiff his property.[29]

     6.       At approximately 2:45 p.m., when Sgt. S. Yorkey arrived to relieve Sgt. Chilson

---

[24]     (Dkt. No. 17, Part 2, ¶ 7 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 12 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Captain Rourke]; *cf.* Dkt. No. 16, ¶ 4 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

[25]     (Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Captain Rourke].)

[26]     (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

[27]     (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

[28]     (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

[29]     (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

of duty, Sgt. Chilson learned that he would not have an opportunity to speak to Sgt. Christopher about Plaintiff's property; as a result, Sgt. Chilson discussed the issue of Plaintiff's property with Sgt. S. Yorkey.[30]  Upon conducting an investigation of the matter, Sgt. Yorkey determined that there was no deprivation order or misbehavior report on record, and concluded that Plaintiff's property should be returned (and Sgt. Chilson concurred with this conclusion).[31]

     7.     At approximately 3:15 p.m., Plaintiff received his property.[32]

### Events of March 21, 2003, to March 28, 2003

     8.     Meanwhile, at approximately 12:25 p.m. on March 21, 2003, after finishing lunch, Plaintiff refused to obey a direct order from C.O. R. Smith to return his food tray, because Plaintiff had not yet received the property at issue.[33]

---

[30]    (Dkt. No. 16, ¶ 10 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Lt. Estabrook]; Dkt. No. 16, Ex. F [Auburn C.F. Memorandum dated 3/28/03 from Sgt. Yorkey to Lt. Estabrook]; Dkt. No. 21, Part 1, ¶ 10 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

[31]    (Dkt. No. 16, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. F [Auburn C.F. Memorandum dated 3/28/03 from Sgt. Yorkey to Lt. Estabrook]; Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 21, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

[32]    (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. F [Auburn C.F. Memorandum dated 3/28/03 from Sgt. Yorkey to Lt. Estabrook]; *cf.* Dkt. No. 16, ¶ 11 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

[33]    (Dkt. No. 16, ¶ 5 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Exs. D, E, F, G, and L [four Auburn C.F. memoranda, and two pages of SHU logbook entries, supporting the asserted fact]; Dkt. No. 16, Ex. J [Pre-Hearing Restricted Diet Order, referring to Plf.'s "refusing to obey a direct order" as the "reason" for the restricted diet order]; Dkt. No. 21, Part 1, ¶ 5 [Plf.'s Rule

9.      At some point on March 21, 2003, as a result of Plaintiff's refusal to comply with a direct order (i.e., to return the food tray), C.O. Smith wrote an Inmate Misbehavior Report.[34] (There is no copy of this misbehavior report on file; it appears that the misbehavior report was submitted but then was dismissed.)[35]

10.      Also at some point on March 21, 2003, as a result of the misbehavior report, Sgt. Chilson recommended, and Capt. Rourke ordered, a pre-hearing restricted diet for Plaintiff.[36] The order provided that Plaintiff would receive the restricted diet from March 21, 2003, to March 28, 2003.[37]

---

7.1 Response, not specifically controverting the asserted fact]; Dkt. No. 1, ¶ 13 [Plf.'s Verified Compl., admitting that he had not returned his food tray after lunch].)

[34]      (Dkt. No. 16, Defs.' Rule 7.1 Statement, ¶ 6; Dkt. No. 16, Exs. D, E, G, H, and J [three Auburn C.F. memoranda, two pages of SHU logbook entries, and a Pre-Hearing Restricted Diet Order, supporting the asserted fact]; Dkt. No. 21, Part 1, ¶ 6 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

[35]      (Dkt. No. 16, ¶ 7 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. I [Auburn C.F. Memorandum dated 4/4/03 from Lt. Estabrook to Capt. Rourke]; Dkt. No. 21, Part 1, ¶ 7 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact]; cf. Dkt. No. 17, Part 4, Ex. Q [Plf.'s proffered "evidence" in opposition to this factual assertion, which "evidence" suggests, at most, that there was "no [such misbehavior] report on [the DOCS] statewide computer [system] for 3-21-03," but not indicating whether there was a record of such a report having been filed during the days following 3/21/03].)

[36]      (Dkt. No. 16, ¶ 8 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. G [two pages of SHU logbook entries, indicating that Sgt. Chilson had been notified after the writing of a misbehavior report]; Dkt. No. 16, Ex. J [Pre-Hearing Restricted Diet Order dated 3/21/03, referring to the misbehavior report as the "reason" for the restricted diet order]; Dkt. No. 21, Part 1, ¶ 8 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact]; Dkt. No. 1, ¶¶ 13-14 [Plf.'s Verified Compl., admitting the fact asserted]; cf. Dkt. No. 17, Part 4, Ex. Y [attaching copy of Deprivation Order dated 3/21/03 referring to Plaintiff's refusal to return his lunch tray].)

[37]      (Id.)

14

11.     At approximately 1:18 p.m. on March 21, 2003, Plaintiff was medically cleared to receive a restricted diet.[38]  During the evening of March 21, 2003, Plaintiff began the pre-hearing restricted diet.[39]  The diet consisted of one apple and a loaf of bread.[40]

12.     Plaintiff claims that he was never served with a copy of the March 21, 2003, pre-hearing restricted diet order.[41]  However, he admits that, on March 24, 2003, he received a copy of an order depriving him of "feed up" trays, which stated that (1) the reason for the order was that "you refused to turn in your feed up tray during garbage collection," and (2) "[y]ou may write to the Deputy Superintendent for Security or his/her designee to make a statement on the need for continuing this deprivation order."[42]

---

[38]     (Dkt. No. 16, ¶ 9 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. G [two pages of SHU logbook entries, indicating communication from medical staff]; Dkt. No. 16, Ex. J [Pre-Hearing Restricted Diet Order, indicating approval]; Dkt. No. 21, Part 1, ¶ 9 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

[39]     (Dkt. No. 16, Ex. G [two pages of SHU logbook entries, indicating that diet was to start at dinner]; Dkt. No. 16, Ex. K [medical record dated 3/22/03 referring to restricted diet as if it were already being imposed]; Dkt. No. 16, Ex. N [medical records of 3/22, indicating that Plaintiff was already on the diet]; Dkt. No. 1, ¶ 14 [Plf.'s Verified Compl., asserting fact].)

[40]     (Dkt. No. 16, Ex. N [medical records of 3/22, 3/23, 3/24, 3/25, 3/26, and 3/28 indicating that Plaintiff was on "loaf" diet]; Dkt. No. 1, ¶ 14 [Plf.'s Verified Compl., asserting fact].)

[41]     (Dkt. No. 1, ¶ 14; Dkt. No. 17, Part 2, ¶ 18; Dkt. No. 21, Plf.'s Rule 7.1 Response, ¶ 15.)

[42]     (Dkt. No. 17, Part 4, Ex. Y [Deprivation Order dated 3/21/03]; Dkt. No. 17, Part 2, ¶¶ 10, 19; Dkt. No. 17, Part 4, Ex. E [Grievance No. 39005, dated 3/27/03, stating, in part, "I showed the Officer who passed out mail the deprivation order.  He told Sgt. Christopher[] about my situation, and no actions were taken to get me another dinner tray."], Dkt. No. 17, Part 4, Ex. H [Grievance No. 39033, dated 3/30/03, stating, in part, "I received a deprivation order on 3/24/03 stating: 'I'm being deprived of Feed up tray.'"]; Dkt. No. 1, ¶ 14 [Plf.'s Verified Complaint, alleging, "Plaintiff only received two 'Deprivation Order forms, depriving me of hard plastic trays."].)

13.     On March 25, 2003, Plaintiff wrote a letter to Superintendent Burge complaining, in part, about being kept on a restricted diet.[43]  In that letter, Plaintiff acknowledged that he had been placed on the restrictive diet as a result of his refusing to return his food tray after lunch on March 21, 2003.[44]  In addition, he argued that he not should not be punished for refusing to return his food tray, since Sgt. Christopher had not been punished for withholding his property.[45]

14.     On March 27, 2003, Plaintiff filed a grievance (No. 39005) complaining about, in part, his unjustified placement on the restricted diet.[46]

15.     Plaintiff was taken off the diet on March 28, 2003.[47]

16.     Throughout the period of time that Plaintiff was on the restricted diet (March 21, 2003, to March 28, 2003), Plaintiff was visited each day by a member of the Auburn C.F. medical staff, who kept notes of the visits in Plaintiff's medical records.[48]  However, those

---

[43]     (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03].)

[44]     (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03, stating, in part, "I am requesting that you take me off this restricted diet.  No actions were taken against the Officer's [sic] that deprived me of my property [on March 20-21, 2003].  Soon as I hold my tray [on March 21, 2003], swift actions is taken against me."].)

[45]     (*Id*.)

[46]     (Dkt. No. 16, ¶ 7 [Defs.' Statement of Facts]; Dkt. No. 21, Part 1, ¶ 7 [not specifically controverting the asserted fact]; Dkt. No. 17, Part 4, Ex. D [attaching Grievance No. 39005, dated 3/27/03]; Dkt. No. 16, Ex. I [Auburn C.F. Memorandum dated 4/4/03 from Lt. Estabrook to Capt. Rourke reporting findings from investigation concerning Grievance No. 39005].)

[47]     (Dkt. No. 16, Ex. N [medical record of 3/28 indicating that Plaintiff had "finished loaf [diet]," and medical records of 3/30, 4/4, 4/5, and 4/6, not mentioning "loaf" diet]; Dkt. No. 1, ¶ 14 [Plf.'s Verified Compl., asserting fact].)

[48]     (Dkt. No. 16, Ex. N [containing daily medical records during this time period].)

medical records do not reflect that Plaintiff made any complaints to medical personnel regarding any illness associated with, or resulting from, his alleged exposure to cold temperatures on the evening of March 20-21, 2003.[49]  Nor do those medical records reflect that he made any complaints to medical personnel regarding any other illness (such as headaches, stomachaches, dizzy spells or gas).[50]

### III.    ANALYSIS OF PLAINTIFF'S MOTION

In support of his motion, Plaintiff failed to submit a Statement of Material Facts that complies with the Local Rules of Practice for this Court.  Local Rule 7.1(a)(3) requires that, in such a Statement of Material Facts, "[e]ach fact listed shall set forth a specific citation to the record where the fact is established."  N.D.N.Y. L.R. 7.1(a)(3).  However, with very few exceptions, none of the "facts" set forth in either of the two documents that Plaintiff offers as a Rule 7.1 Statement complies with this citation requirement.  (*See generally* Dkt. No. 17, Part 1 [purporting to contain factual assertions filed "Pursuant to Rule 7.1 of the Civil Rules of this Court"]; Dkt. No. 17, Part 2 [labeled as an "Affidavit of Undisputed Facts"].)  This failure to submit an accurate and complete Rule 7.1 Statement provides sufficient reason to recommend denial of Plaintiff's motion.  N.D.N.Y. L.R. 7.1(a)(3) ("<u>Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion</u>.") [emphasis in original].

Even if I were to rely on the few record citations offered by Plaintiff, and I were to

---

[49]    (Dkt. No. 16, ¶ 14 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. N [containing daily medical records during this time period]; Dkt. No. 21, Part 1, Plf.'s Rule 7.1 Response, ¶ 14 [not specifically controverting the asserted fact].)

[50]    (Dkt. No. 16, Ex. N [containing daily medical records during this time period].)

conduct an independent review of the record with respect to the remainder of Plaintiff's factual

assertions, I would conclude that Plaintiff's factual assertions are supported by the record *only* to

the extent that those factual assertions conformed with the eleven factual assertions stated above

in Part II of this Report-Recommendation.  These facts are not sufficient to entitle Plaintiff to

judgment as a matter of law.  (Indeed, they entitle *Defendants* to judgment as a matter of law, for

the reasons discussed below in Part IV of this Report-Recommendation.)  Nor are the factual

insufficiencies of Plaintiff's motion somehow overcome by his legal arguments, which are

unpersuasive.  (Dkt. No. 17, Part 3 at 4-37.)

As a result, I recommend denial of Plaintiff's motion for summary judgment.

## IV.    ANALYSIS OF DEFENDANTS' CROSS-MOTION

### A.    Whether Plaintiff Has Established an Eighth Amendment Claim with Respect to the Alleged Deprivation of His Personal Property

Plaintiff's allegations of inadequate conditions of confinement are appropriately analyzed

under the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments."

*See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 346-347

(1981).  "[A] prison official violates the Eighth Amendment only when two requirements are

met.  First, the deprivation must be, objectively, 'sufficiently serious'. . . .  [Second,] a prison

official must have a 'sufficiently culpable state of mind.'"  *Farmer*, 511 U.S. at 834.

With regard to the first element, "the plaintiff must demonstrate that the conditions of his

confinement resulted in 'unquestioned and serious deprivations of basic human needs' or

'deprive inmates of the minimal civilized measures of life's necessities.'"  *Davidson v. Murray*,

371 F. Supp.2d 361, 370 (W.D.N.Y. 2005) (citing *Rhodes*, 452 U.S. at 347).  "As recognized by

the Supreme Court in *Rhodes*, 'the Constitution does not mandate comfortable prisons,' . . . and conditions that are 'restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society.'" *Davidson*, 371 F. Supp.2d at 370 (quoting *Rhodes*, 452 U.S. at 347, 349).

Specifically, a prisoner must prove that he has been deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Heat is a basic human need; and claims of lack of heat may state a claim. *Benjamin v. Fraser* 343 F.3d 35, 52 (2d Cir. 2003). If, however, the condition is not sufficiently prolonged or severe, it does not rise to the level of an Eighth Amendment violation. *Trammel v. Keane*, 338 F.3d 155, 164-65 (2d. Cir. 2003).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety . . . ." *Farmer*, 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. In other words, "this standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Farmer*, 511 U.S. at 841).

Generally, I agree with Defendants' application of the above legal standard to the relevant facts of this case (Dkt. No. 17, Part 1, Mem. of Law, at 5-6), and I reject Plaintiff's application of the standard to the facts (Dkt. No. 21, Part 1, Mem. of Law, at 12-14). At most, Plaintiff was

deprived of various property (except for a T-shirt and underwear) for less than one day while

confined to a cell that was "cold" or "very cold" due to some gallery windows being open in late-

March in Auburn, New York.  (*See*, *supra*, Statement of Fact Nos. 2-7.)  I can find no allegation

in Plaintiff's Complaint, or any evidence in the record, that the temperature in Plaintiff's cell was

near or below freezing (e.g., that the water in his sink or toilet was frozen), or even that the

heating system serving the cell block was not working.  Even assuming Plaintiff's mattress,

pillow and cell light provided no warmth to him, and even assuming Plaintiff acquired a cold as a

result of the deprivation of property,[51] I simply cannot find that the deprivation was sufficiently

severe and prolonged to rise to the level of an Eighth Amendment violation.[52]  (Cases finding

---

[51]      I note, incidentally, that Plaintiff's medical records suggest that any cold that
Plaintiff was allegedly suffering from on March 21, 2003, may have been bothering him for a
week before the night of March 20-21, 2003.  (Dkt. No. 16, Ex. N [Plf.'s medical record of
3/15/03, stating "Seen on Sick Call . . . Requesting Throat Lozenges."].)

[52]      *See Trammel v. Keane*, 338 F.3d 155, 158-159, 164 (2d Cir. 2003) (affirming
grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based
on [1] deprivation of all property except one pair of undershorts and [2] exposure to "bitter cold,"
because the temperatures to which inmate was exposed were not cold enough, and the period of
time in which he was deprived of clothing–seventeen days–was not long enough); *Davis v.
Buffardi*, 01-CV-0285, 2005 WL 1174088, at *2 (N.D.N.Y. May 4, 2005) (Magnuson, J.)
(granting defendants' motion for summary judgment dismissing claim of inadequate prison
conditions under Fourteenth Amendment based on denial of extra blankets and clothing for ten
days in February, during which period prison's boiler was not working, because pretrial detainees
failed to submit any evidence that "the temperature in [the prison] was so cold that Plaintiffs
experienced substantial harm"); *Grant v. Riley*, 89-CV-0359, 1993 WL 485600, at *4 (S.D.N.Y.
Nov. 24, 1993) (granting defendants' motion for summary judgment dismissing Eighth
Amendment claim because "plaintiff . . . has alleged only a three-day period of exposure" to cold
without adequate clothing); *Scot v. Merola*, 555 F. Supp. 230, 231-234 (S.D.N.Y. 1983)
(granting defendants' Rule 12[b][6] motion to dismiss inmate's Eighth Amendment claim based
on his incarceration for three-and-a-half months on Rikers Island in housing area without heat
where windows were broken, and temperature dropped below fifty degrees); *see also Hadley v.
Peters*, No. 92-2726, 1993 WL 475407, at *1 (7th Cir. Nov. 18, 1993) (affirming grant of
defendants' motion for summary judgment dismissing Eighth Amendment claim based on
exposure to cold for five days in early April due to malfunctioning heating system, because "the

such a violation are clearly distinguishable.)[53]

Moreover, even if Plaintiff had established a sufficiently serious deprivation for purposes of the Eighth Amendment, I would not find that he had established that any Defendant acted with a sufficiently culpable state of mind with regard to that deprivation.[54]  Plaintiff concedes that, in the middle of the deprivation in question (at approximately 7:30 a.m. on March 21, 2003), he was seen by a facility nurse, who gave him Sudafed for sinus congestion.  (*See*, *supra*, Statement of Fact No. 4.)  Moreover, Defendants Chilson and Rourke appeared to have acted in good faith in responding to Plaintiff's complaints of being cold.  (*See*, *supra*, Statement of Fact Nos. 4-7.)[55] At *most*, Plaintiff may have suggested some neglect on the part of Defendants Christopher and/or

---

temperatures in area of the prison ranged from 29 to 68 degrees Fahrenheit").

[53]  *See*, *e.g.*, *Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (reversing grant of defendants' motion for summary judgment dismissing Eighth Amendment claim where inmate established that he had been exposed to *subfreezing* temperatures for the majority *three month period* in fall and winter); *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (reversing grant of defendants' motion for summary judgment dismissing Eighth Amendment claim where inmate established that he had been exposed to, *inter alia*, temperatures *near or well below freezing* for *five-month period* during winter); *see also Wright v. McMann*, 387 F.2d 519, 521-522, 526 (2d Cir. 1967) (reversing Rule 12[b][6] dismissal of Eighth Amendment claim alleging that inmate was, *inter alia*, stripped completely *nude* and exposed to *subfreezing* temperatures for 11 days during winter in Upstate New York, then was provided a "thin pair of underwear" for another 22 days under similar conditions, and then–a year later–was confined for 21 days under similar conditions).

[54]  *See*, *e.g.*, *Trammel*, 338 F.3d at 164-165 (no deliberate indifference where nurse regularly observed inmate to ensure that his health was not jeopardized during period of deprivation, which included having to wear only undershorts while being exposed to "bitter cold" for seventeen days).

[55]  For example, Defendant Chilson--once he realized that he would not have an opportunity to speak to Defendant Christopher during the 3:00 p.m. shift change to determine if a deprivation order or misbehavior report had been filed--agreed with the sergeant who was replacing him (Sgt. Yorkey) that Plaintiff's personal property should be returned to him.  (*See*, *supra*, Statement of Fact Nos. 5-6.)

Myers with respect to Plaintiff's comfort.  (*See, supra*, Fact Nos. 2-3.)[56]  However, negligence is not sufficient to establish an Eighth Amendment claim.  *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").[57]

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim with respect to the alleged deprivation of his personal property.

> **B.   Whether Plaintiff Has Established a Fourteenth Amendment Claim with Respect to the Alleged Deprivation of His Personal Property**

Defendants argue that Plaintiff's Fourteenth Amendment claim is only a substantive due process claim,[58] while Plaintiff appears to argue that his Fourteenth Amendment claim is actually a procedural due process claim.[59]  Given my duty to liberally construe a *pro se* civil rights inmate's pleadings and papers, and in the interest of thoroughness, I will consider Plaintiff's Fourteenth Amendment claim under both a substantive due process analysis and a procedural due process analysis.

---

[56]      I note that Defendants assert that Defendant Christopher withheld Plaintiff's property because Plaintiff had become agitated when Defendant Christopher had entered his cell, and Plaintiff had refused a direct order to turn on his cell light.  (Dkt. No. 16, Ex. C [Auburn C.F. Memorandum dated 3/29/03 from Sgt. Christopher to Lt. Estabrook]; *see also*, *supra*, Statement of Fact No. 3.)

[57]      *See also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Trammel*, 338 F.3d at 165 ("Negligence does not . . . satisfy the scienter requirement necessary to support a claim for 'cruel and unusual punishment.'") [citation omitted].

[58]      (Dkt. No. 16, at 6-8 [Defs.' Mem. of Law].)

[59]      (Dkt. No. 17, Part 3, at 10-11, 21-23 [Plf.'s Mem. of Law, Point I, ¶¶ 10-11, 13; Point II, ¶¶ 11-12, 14]; Dkt. No. 21, Part 1, at 14-16, 21 [Plf.'s Opp. Mem. of Law].)

The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch*, 494 U.S. 113, 125 (1990).  The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon*, 494 U.S. at 125 [internal quotations marks and citation omitted].  The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property . . . *without due process of law*." *Id.* at 125-126 [internal quotations marks and citations omitted; emphasis in original].  One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

### 1.      Substantive Due Process Claim

"Substantive due process protects individuals against government action that is arbitrary, . . . conscience-shocking, . . . or oppressive in a constitutional sense, . . . but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) [internal quotations marks and citations omitted], *aff'g*, 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

The first step in a substantive due process analysis is to identify the precise constitutional right at stake.  Here, I will assume for the sake of argument that Plaintiff had a substantive due process right to possess the property in question (e.g., pants and a sweatshirt) unless grounds existed for a corrections officer to determine the existence of a threat to the safety or security of

23

the facility's staff.  *See* 7 N.Y.C.R.R. § 305.2(a),(b) ("An order depriving an inmate of a specific

item . . . may be issued when it is determined that a threat to the safety or security of staff,

inmates, or State property exists. . . .").

Having identified the constitutional interest at stake, I must now consider whether the

state action–the withholding of that property–was arbitrary in the constitutional sense and

therefore violative of substantive due process.  The basis (proffered by Defendants) for the

withholding of the property in question was Plaintiff's extreme agitation upon Defendant

Christopher's entrance into his cell, and Plaintiff's refusal to obey Defendant Christopher's direct

order to turn on the cell's light.[60]  Under the circumstances, I find that the conduct attributed to

Plaintiff by Defendant Christopher, which occurred in a dark prison cell in the facility's SHU,

*arguably* created a threat to the safety or security of Defendant Christopher (and any other

corrections officer who would dare carry property into such an agitated inmate's small dark

cell).[61]  Thus, I find that the subsequent deprivation of the property in question was not *arbitrary*

or *conscience shocking.  See generally Lowrence*, 20 F.3d at 537 (reaching similar conclusion

after similar analysis).

---

[60]     (Dkt. No. 16, Ex. C [Auburn C.F. Memorandum dated 3/29/03 from Sgt. Christopher to Lt. Estabrook].)  I note that this asserted refusal by Plaintiff to comply with a direct order to turn on the cell light is consistent with Plaintiff's admitted refusal, approximately fourteen hours later, to return his lunch tray, which was also motivated by Plaintiff's unhappiness with feeling cold.

[61]     I note that it is not material to a substantive due process claim whether an inmate's conduct "in fact gave [a corrections officer] reasonable grounds to believe that [the inmate] posed a threat to the order of the [correctional] facility or whether [the alleged deprivation sustained by the inmate] therefore in fact violated [a particular DOCS rule or regulation]."  *Lowrence*, 20 F.3d at 537, n.6.  This is because the standard on such a claim is whether Defendants' conduct was *arbitrary.*

As a result, I conclude that Plaintiff has failed to establish a substantive due process claim with respect to the alleged deprivation of his property.

### 2.     Procedural Due Process Claim

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State . . . ; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient . . . ." *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Relying on 7 N.Y.C.R.R. § 305.2, Plaintiff argues that he had a procedural due process right to possess the property in question (e.g., pants and a sweatshirt) unless notice of a deprivation order and an opportunity to be heard had been provided to him before the deprivation, or were provided to him *within 21 hours* after the deprivation (i.e., between 6:15 p.m. on March 20, 2003, and 3:15 p.m. on March 21, 2003).  (Dkt. No. 21, Part 1, Plf.s Opp. Mem. of Law, at 14-16.)  Plaintiff is mistaken for three independent reasons.

First, I do not believe that 7 N.Y.C.R.R. § 305.2 confers on Plaintiff a procedural due process right.  The only two cases that I could find suggesting that 7 N.Y.C.R.R. § 305.2 might confer a procedural due process liberty interest were based on a rule that is no longer valid.[62] Before the Supreme Court's decision in *Sandlin v. Connor* on June 19, 1995, the rule was that a state could create a liberty interest protected by the Fourteenth Amendment's Due Process Clause

---

[62]     *See DeMaio v. Mann*, 877 F. Supp. 89, 94 (N.D.N.Y.) (Kaplan, J.) ("Section 305.2 is *sufficiently definite* to create a [Fourteenth Amendment procedural due process] liberty interest in the inmate . . . .") [emphasis added and citation omitted], *aff'd*, 122 F.3d 1055 (2d Cir. 1995); *Young v. Scully*, 91-CV-4801, 1993 WL 88144, at *3 (S.D.N.Y. March 22, 1993) ("[T]he language in Regulation 7 N.Y.C.R.R. § 305.2(a), by requiring *specific substantive predicates* for issuance of deprivation orders, creates a liberty interest which may not be deprived without due process.") [emphasis added].

if the state law repeatedly used explicit language of an unmistakably mandatory character in connection with requiring specific substantive predicates.[63]  However, over time, the Supreme Court recognized that such a rule created a perverse incentive (1) for inmates to "comb" state regulations for mandatory language upon which to base claims of entitlements, (2) for courts to draw negative inferences from mandatory language in state regulations, and to involve themselves in the day-to-day management of prisons, and (3) for states to not codify prison management procedures, or to confer on correctional personnel "standardless discretion."[64]  As a result, the Supreme Court changed the rule, shifting the courts' focus from the language of a particular state law or regulation to the nature of the deprivation.[65]  Specifically, the Supreme Court held that, while states may still under certain circumstances create a liberty interest protected by the Fourteenth Amendment's Due Process Clause, the interest "will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[66]  I have found no cases, since the Supreme Court's issuance of its decision in *Sandlin*, holding that 7 N.Y.C.R.R. § 305.2 confers on Plaintiff a procedural due process right.

Second, even if 7 N.Y.C.R.R. § 305.2 did confer on Plaintiff a procedural due process

---

[63]     *Hewitt v. Helms*, 459 U.S. 460, 466-472 (1983).

[64]     *Sandlin v. Connor*, 515 U.S. 472, 477-484 (1995).

[65]     *Sandlin*, 515 U.S. at 483-484; *see also Blouin v. Spitzer*, 356 F.3d 348, 362-363 (2d Cir. 2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord*, *Anderson v. Recore*, 317 F.3d 194, 198-200 (2d Cir. 2003), *accord*, *Watson v. City of N.Y.*, 92 F.3d 31, 37-38 (2d Cir. 1996), *accord*, *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).

[66]     *Sandlin*, 515 U.S. at 483-484.

right, 7 N.Y.C.R.R. § 305.2 does not appear to require that Plaintiff be provided with notice and

an opportunity to be heard *within 21 hours* after a deprivation.[67]  Indeed, 7 N.Y.C.R.R. § 305.2

expressly provides only that inmates be provided a copy of the deprivation order *within 24 hours*

of the deprivation.[68]  I find that this 24-hour filing-and-service deadline, at least with respect to

deprivations of the sort of property at issue in this case, does not deprive inmates of an

opportunity to be heard "at a meaningful time," as required by the Supreme Court.[69]  As a district

court stated in a case relied on by Plaintiff: "[A]n inmate is not necessarily entitled to a full

panoply of procedural safeguards.  The process required is determined by balancing the private

interests affected against the interests and concerns of the government."  *Young*, 1993 WL 88144,

at *3.  Requiring that an inmate be provided notice and an opportunity to be heard within a few

hours of a deprivation of property, under circumstances such as these, would appear to be

administratively unfeasible from a correctional facility's perspective.  (For example, here, the

deprivation occurred late at night and was effected by a corrections officer who was not on duty

the following morning.)

    Third, a credible argument can be made that, here, Plaintiff was indeed provided notice

---

[67]     *See DeMaio*, 877 F. Supp. at 94 ("[The] due process [required by 7 N.Y.C.R.R. § 305.2] is satisfied if the inmate is provided with notice and an opportunity to make a statement to the official responsible for the [deprivation] order."); *Young*, 1993 WL 88144, at *3 ("[A]n informal, nonadversary review is sufficient to satisfy the due process requirement [imposed by 7 N.Y.C.R.R. § 305.2].") [internal quotation marks and citations omitted].

[68]     *See* 7 N.Y.C.R.R. § 305.2(b) ("A deprivation order must be authorized by the officer of the day . . . or the deputy superintendent for security services or higher ranking authority.  Initial authorization may be given verbally but must be confirmed in writing *within 24 hours* with a copy to the superintendent, and one copy to the inmate.") [emphasis added].

[69]     *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) [citations omitted].

and an opportunity to be heard within 21 hours of the deprivation.  Specifically, Plaintiff

concedes that, at the time of the deprivation, Defendant Christopher told him, "You refused to

follow procedures [regarding the turning on of the cell light]."[70]  Thus, Plaintiff was arguably

provided *notice* of the reason for the deprivation sufficient for him later to be able to dispute that

reason.  In addition, Plaintiff concedes that, during the following 12 hours, he had an opportunity

to speak to both Defendant (Captain) Rourke and Defendant (Sergeant) Chilson–two fairly high-

ranking employees of Auburn C.F.–about the deprivation at issue.[71]  In at least one of the

conversations, Plaintiff specifically argued that "I never refused to turn on the light."[72]  These

conversations resulted in Defendant Chilson speaking to Sgt. Yorkey about the matter, who (after

conducting an investigation) decided to return the property at issue (which was immediately

returned to Plaintiff).[73]  Thus, Plaintiff was arguably provided an *opportunity to be heard* with

regard to the deprivation.

    For these reasons, I conclude that Plaintiff has failed to establish either part of the above-

stated two-part test: Plaintiff has not established that he had any property interest *that was*

*interfered with by the State*; and, even if Plaintiff had established such a property interest

interfered with by the State, he has not established that the procedures provided upon that

deprivation were *constitutionally insufficient*.  As a result, I conclude that Plaintiff has failed to

---

[70]       (*See*, *supra*, Statement of Fact No. 3.)

[71]       (*See*, *supra*, Statement of Fact Nos. 4-5.)

[72]       (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03, in which he
states, in part, that when he spoke to Sgt. Chilson on the morning of 3/21, "I then informed Sgt.
Chilson[] that I never refused to turn on the light, or take my personal or State property."].)

[73]       (*See*, *supra*, Statement of Fact Nos. 6-7.)

establish a procedural due process claim with respect to the alleged deprivation of his personal property.

### C.     Whether Plaintiff Has Established an Eighth Amendment Claim with Respect to His Placement on a Restricted Diet

As stated above, "a prison official violates the Eighth Amendment only when two requirements are met.  First, the deprivation must be, objectively, 'sufficiently serious'. . . . [Second,] a prison official must have a 'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834.

With respect to the first prong, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1983) [citations omitted].   For example, "the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food . . . . [that does not] present an immediate danger to health and well being of the inmates who consume it." *Robles*, 725 F.2d at 15 [internal quotation marks and citation omitted].[74]

With respect to the second prong, as stated above, a deliberate indifference to inmate health or safety may be shown where a prison official knew a diet was inadequate and likely to inflict pain.  *See Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) (by alleging that prison officials knew a diet was inadequate and likely to inflict pain, the plaintiff sufficiently pleaded the second element of an Eighth Amendment claim).

---

[74]     *See Chapdelaine v. Keller*, 95-CV-1126, 1998 WL 357350, at *12 (N.D.N.Y Apr. 16, 1998) (Sharpe, M.J.) ("[T]he Eighth Amendment requires that prisoners receive nutritionally adequate food prepared and served in conditions that do not present an immediate danger to the health of the inmates who consume it").

Generally, I agree with Defendants' application of the above legal standard to the relevant facts of this case (Dkt. No. 17, Part 1, Mem. of Law, at 8-12), and I reject Plaintiff's application of the standard to the facts (Dkt. No. 21, Part 1, Mem. of Law, at 16-20).  At most, Plaintiff was deprived of food that tasted good for a period of seven days.  (*See*, *supra*, Statement of Fact Nos. 8-11.)  Plaintiff does not establish, or even specifically allege, that (1) the food he was served was nutritionally inadequate (e.g., with respect to the total calories it contained, its grams of carbohydrates, protein, fiber, and fat, or its units of vitamins and minerals, etc.),[75] (2) that he was physically unable to eat the food, or (3) that he lost weight during the week in question.[76]  Rather, Plaintiff seems to rely only on the fact that medical records exist indicating that he complained of a headache and gas two days after he was taken off the diet, and headaches, stomachaches, dizzy spells and gas six days after he was taken off the diet (but not during the diet).[77]  Under the circumstances, I simply cannot find that Plaintiff has established that he experienced a sufficiently serious deprivation for purposes of the Eighth Amendment.[78]  (The relatively few

---

[75]   (*See*, *e.g.*, Dkt. No. 1, ¶¶ 14, 17, 19, 20 [Plf.'s Verified Compl., alleging conclusorily that the diet, which consisted of "1-apple, and a hard loaf of bread," did not meet Plaintiff's "basic minimum needs" and constituted a "reckless disregard of plaintiff's health"].)

[76]   Nor can Plaintiff make this argument, since he refused to let a nurse weigh him during the week in question.  (Dkt. No. 16, Ex. N [Plf.'s medical record of 3/22, stating "Refuses Wt. & BP"]; Dkt. No. 21, Part 4 at 25 ["Refusal of Medical Examination and/or Treatment" Form, dated 3/22].)

[77]   (Dkt. No. 16, Ex. N [Plf.'s medical record of 3/30, noting request for Tylenol and complaint of gas, and medical record of 4/4, noting complaints of headaches, stomachaches, dizzy spells, and gas].)

[78]   *See McEachin v. McGuinnis*, 357 F.3d 197, 199-201 (2d Cir. 2004) (affirming district court's Rule 12 dismissal of Eighth Amendment claim alleging, *inter alia*, that inmate was placed on a restricted diet consisting of "loaf" for seven days); *Johnson v. Gummerson*, 98-CV-0004, Memorandum-Decision & Order (N.D.N.Y. March 1, 1999) (Scullin, C.J.) (no Eighth

cases finding such a sufficiently serious deprivation are clearly distinguishable.)[79]

Moreover, even if Plaintiff had established a sufficiently serious deprivation for purposes

of the Eighth Amendment, I would not find that he had established that any Defendant acted with

a sufficiently culpable state of mind with regard to that deprivation.[80]  It is uncontroverted that

---

Amendment violation where inmate was placed on restricted diet consisting of "food loaf" for
seven days), *aff'd*, 198 F.3d 233 (2d Cir. 1999) (unpublished opinion); *Dumpson v. Rourke*, 96-
CV-0621, 1997 WL 610652, at *1, 7-8 (N.D.N.Y. Sept. 26, 1997) (Pooler, J.) (no Eighth
Amendment violation where plaintiff was placed on restricted "loaf and cabbage" diet for seven
days); *Porter v. Coombe*, 97-CV-2394, 1999 WL 587896, at *1, 3 & n.2 (S.D.N.Y. Aug. 4, 1999)
(no Eighth Amendment violation where plaintiff was placed on restricted diet of "cabbage-
loaves" for 22-day period, 18-day period and 14-day period within a span of two months, even
where inmate was allergic to two of the ingredients in the "cabbage-loaves"); *Breazil v. Bartlett*,
998 F. Supp. 236, 240-242 (W.D.N.Y. 1997) (no Eighth Amendment violation where inmate was
placed on pre-hearing restricted diet consisting of "Nutriloaf" and one cup of raw cabbage for
one week [i.e., from 6/27-7/4], and a post-hearing restricted diet consisting of Nutriloaf and
cabbage for 45 days); *James v. Coughlin* 13 F. Supp.2d 403, 412 (W.D.N.Y. 1998) (no Eighth
Amendment violation where plaintiff was placed on a pre-hearing restricted diet for three days);
*Adams v. Kincheloe*, 743 F. Supp. 1385, 1388-1393 (E.D. Wash. 1990) (no Eighth Amendment
violation where plaintiff was placed on pre-hearing restricted diet consisting of "nutra-loaf" for
five days); *cf. U.S. v. State of Mich.*, 680 F. Supp. 270, 271-272, 279 (W.D. Mich. 1988)
(prisons' use of "food loaf" to feed inmates who engaged in prohibited cafeteria behavior did not
violate Eighth Amendment).

[79]     *See, e.g., Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001)
(Kahn, J.) (material issue of fact existed with regard to inmate's Eighth Amendment claim where
evidence showed that inmate was deprived of two out of three meals per day for eight days);
*Moss v. Ward*, 450 F. Supp. 591, 594, 597 (W.D.N.Y. 1978) (material issue of fact existed with
regard to inmate's Eighth Amendment claim where evidence showed that inmate was *completely*
deprived of food for four consecutive days, and was given only one meal a day for next three
days).

[80]     *See Trammel*, 338 F.3d at 158-159, 162-164 (no deliberate indifference where
nurse regularly observed inmate while he was on restricted diet of "nutriloaf" for 95 days);
*Breazil*, 998 F. Supp. at 242 (no deliberate indifference where defendants sufficiently
demonstrated that the dietary restrictions were imposed in good-faith effort to restore or maintain
discipline after inmate's prohibited act); *Dumpson*, 1997 WL 610652, at *1, 7-8 (no deliberate
indifference where inmate received medical attention before and during the seven-day period in
which he was on restricted "loaf and cabbage" diet); *Phelps v. Kapnolas*, 94-CV-7543, 2005 WL
1313444, at *6-8 (W.D.N.Y. June 1, 2005) (no deliberate indifference where there was no

(1) Plaintiff had been medically cleared, and a Restricted Diet Order had been issued, before Plaintiff was placed on the restricted diet, (2) during the seven days that he was on the restricted diet, Plaintiff received daily visits from members of the Auburn C.F. medical staff, who kept notes of the visits in Plaintiff's medical records, and (3) those medical records do not indicate that, during the duration of the restricted diet, Plaintiff complained to medical personnel regarding any illness (such as headaches, stomachaches, dizzy spells or gas).[81]

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim with respect to his placement on a restricted diet.

### D.    Whether Plaintiff Has Established a Fourteenth Amendment Claim with Respect to His Placement on a Restricted Diet

Again, Defendants argue that Plaintiff's Fourteenth Amendment claim is only a substantive due process claim,[82] while Plaintiff appears to argue that his Fourteenth Amendment claim is actually a procedural due process claim.[83]  In the interest of fairness and thoroughness, I will consider Plaintiff's Fourteenth Amendment claim under both a substantive due process analysis and a procedural due process analysis.

_____

evidence to establish that defendants were put on notice that the food being served to plaintiff on the restricted diet was causing him to receive inadequate nutrition); *Porter*, 1999 WL 587896, at *1, 3 & n.2 (no deliberate indifference where inmate received medical attention before and during the two-month time period that he was on restricted diet of "cabbage-loaves").

[81]    (*See*, *supra*, Statement of Fact Nos. 10, 11, 16.)

[82]    (Dkt. No. 16, at 12-14 [Defs.' Mem. of Law].)

[83]    (Dkt. No. 17, Part 3, at 17-27 [Plf.'s Mem. of Law, Point II, ¶¶ 4, 6-7, 10-12, 14]; Dkt. No. 21, Part 1, at 21-24 [Plf.'s Opp. Mem. of Law].)

### 1.      Substantive Due Process Claim

As stated above, "[s]ubstantive due process protects individuals against government action that is arbitrary, . . . conscience-shocking, . . . or oppressive in a constitutional sense, . . . but not against constitutional action that is incorrect or ill-advised." *Lowrence*, 20 F.3d at 537.

The first step in a substantive due process analysis is to identify the precise constitutional right at stake.  Here, I will assume for the sake of argument that Plaintiff had a substantive due process right to not be placed on a restricted diet unless grounds existed for a corrections officer to determine that Plaintiff had refused to obey a direct order to return his food tray at the conclusion of lunch.  *See* 7 N.Y.C.R.R. § 304.2(b)(3) ("Inmates may be placed on a restricted diet in accordance with the provisions of Chapter V of this Title, for the following reasons: . . . refusing to obey a direct order to return a food container or utensil at the conclusion of a meal, while assigned to SHU.").

Having identified the constitutional interest at stake, I must now consider whether the state action–the imposition of a restricted diet–was arbitrary in the constitutional sense and therefore violative of substantive due process.  The basis (proffered by Defendants) for the imposition of the restricted diet was Plaintiff's refusal to obey a direct order to return his food tray at the conclusion of lunch.  Indeed, Plaintiff concedes that, at approximately 12:25 p.m. on March 21, 2003, after finishing lunch, he refused to obey a direct order from C.O. R. Smith to return his food tray, because he had not yet received his property.[84]  Under the circumstances, I find that the subsequent imposition of a restricted diet was not *arbitrary* or *conscience shocking*.

As a result, I conclude that Plaintiff has failed to establish a substantive due process claim

---

[84]      (*See*, *supra*, Statement of Fact No. 8.)

with respect to the imposition of a restricted diet.

### 2.    Procedural Due Process Claim

As stated above, "[courts] examine procedural due process questions in two steps: the

first asks whether there exists a liberty or property interest which has been interfered with by the

State . . . ; the second examines whether the procedures attendant upon that deprivation were

constitutionally sufficient . . . ." *Kentucky Dept. of Corr.*, 490 U.S. at 460.

Relying on 7 N.Y.C.R.R. § 304.2,[85] Plaintiff argues that he had a procedural due process

right to not be kept on a restricted diet after Defendants' failure (1) to serve him with a copy of

the pre-hearing restricted diet order within 24 hours of that order's issuance on March 21, 2003,

and (2) to schedule a superintendent's hearing (on the misbehavior report authored by C.O.

Smith) within seven days of the initiation of the diet on March 21, 2003 (or even serve him with

a copy of any misbehavior report authored by C.O. Smith).  (Dkt. No. 21, Part 1, Plf.s Opp.

Mem. of Law, at 21-24.)  Plaintiff is mistaken for two independent reasons.

---

[85]    Title 7, Section 304.2 of the New York Code of Rules and Regulations provides,
in pertinent part:

> The superintendent or his designee may issue a written order
> placing an inmate reported to have engaged in conduct described in
> subdivision (b) of this section [which conduct includes refusing to
> obey a direct order to return a food container at the conclusion of a
> meal] on a restricted diet for no more than seven days pending the
> outcome of the inmate's superintendent's hearing.  The order shall
> briefly state the reason(s) for the imposition of the restricted diet and
> contain the following notice to the inmate: 'You may write to the
> deputy superintendent of security or his/her designee to make a
> statement as to the need for the continued pre-hearing imposition of
> the restricted diet."  One copy of the order shall be given to the inmate
> and another copy forwarded to the commissioner within 24 hours of
> issuance.

7 N.Y.C.R.R. § 304.2.

First, I do not believe that 7 N.Y.C.R.R. § 304.2 confers on Plaintiff a procedural due process right. As with respect to cases applying 7 N.Y.C.R.R. § 305.2, there appears to be a dearth of cases on point with respect to cases applying 7 N.Y.C.R.R. § 304.2.[86] However, as explained above in Part IV.B.2. of this Report-Recommendation, to establish a Fourteenth Amendment claim based on a violation of 7 N.Y.C.R.R. § 304.2, Plaintiff must show that the restricted diet constituted an *atypical and significant hardship* in relation to the ordinary incidents of prison life.[87] Several courts (including this Court) have specifically held that the imposition of a seven-day pre-hearing restricted diet of "loaf" (imposed without the issuance of a deprivation order or the holding of a hearing during the seven-day period) did not create an atypical and significant hardship for purposes of the Fourteenth Amendment.[88]

---

[86]     I note that the few cases I have found that expressly address the issue (of whether 7 N.Y.C.R.R. § 304.2 creates a due process interest) either do not decide the issue or indicate that 7 N.Y.C.R.R. § 304.2 does not create such an interest. *See, e.g., Breazil v. Bartlett*, 998 F. Supp. 236, 243 (W.D.N.Y. 1997) ("[E]ven assuming for the purposes of this case that plaintiff had a protected liberty or property interest in remaining free from . . . dietary restrictions [pursuant to 7 N.Y.C.R.R. § 304.2], . . . I find that plaintiff received all the process he was due under the circumstances."); *Flemmings v. Kinney*, 02-CV-9989, 2004 WL 1672448, at *5 (S.D.N.Y. July 27, 2004) ("[T]o the extent that plaintiff alleges that the restrictions imposed by the regulations [including 7 N.Y.C.R.R. § 304.2] constitute a due process violation, such restrictions, by themselves, do not add to plaintiff's [Fourteenth Amendment] claim."); *cf. Porter v. Coombe*, 97-CV-2394, 1999 U.S. Dist. LEXIS 11924, at *11-12 (S.D.N.Y. Aug. 4, 1999) (holding that inmate did not establish that New York State, by regulation or statute, had granted him a protected liberty interest in remaining free from being placed on a *post*-hearing restricted diet).

[87]     *See, e.g., McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) (requiring both the existence of a state law creating a liberty interest and the existence of an atypical and significant hardship to show a due process interest in remaining free from being placed on a *post*-hearing restricted diet); *Beckford*, 151 F. Supp.2d at 219 (requiring both the existence of a state law creating a liberty interest and the existence of an atypical and significant hardship to show a due process interest in remaining free from being placed on a *pre*-hearing restricted diet).

[88]     *See, e.g., Beckford*, 151 F. Supp.2d at 208-209, 218-219 & n.4  (not mentioning 7 N.Y.C.R.R. § 304.2, but granting defendants' motion for summary judgment as to plaintiff's due

Second, even if Plaintiff had a Fourteenth Amendment procedural due process right to remain free from being placed on the restricted diet, I find that he was, under the circumstances, afforded all the process that he was due.  It is uncontroverted that a Restricted Diet Order was issued in this case.[89]  While it is unclear whether Plaintiff was served with a copy of that Order within 24 hours of its issuance, I find that Plaintiff had adequate notice of the contents of that Order within a few hours of its issuance.  Specifically, I find that no reasonable fact finder could, under the circumstances, credit any assertion by Plaintiff that, on the evening of March 21, 2003, when he started his restricted diet, he did not know that the diet resulted from his intentionally withholding his food tray after lunch that day.[90]  Furthermore, by March 24, 2003 (at the very latest), Plaintiff was on notice that, if he wanted to make a statement regarding the need for the continuation of a deprivation order (such as the restricted diet), he may write to the deputy superintendent of security or his/her designee.[91]  On March 25, 2003, and March 27, 2003, he exercised that right, sending a letter of complaint to the Superintendent, and filing a grievance

---

process claims because a seven-day *pre*-hearing restricted diet--imposed between 1/17/97 and 1/24/97--did not impose an atypical and significant hardship; stating, "In light of the minimal amount of time that Plaintiff's dietary . . . restrictions were put in place, the Court holds, as a matter of law, that his confinement was not sufficiently atypical to implicate a protected liberty interest"); *Turnboe v. Gundy*, 25 Fed. Appx. 292, 293 (6th Cir. 2001) (being placed on a pre-hearing restricted diet consisting of "food loaf" for seven days does not constitute an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison life) [citations omitted], *accord, Thomas v. Virginia*, 04-CV-0273, 2005 WL 15517, at *10-11 (W.D. Va. July 28, 2005); *see also McEachin*, 357 F.3d at  200 (not deciding whether such a state law exists, after finding that a seven-day *post*-hearing restricted diet did not impose an atypical and significant hardship).

[89]        (*See, supra*, Statement of Fact No. 10.)

[90]        (*See, e.g., supra*, Statement of Fact No. 13.)

[91]        (*See, supra*, Statement of Fact No. 12.)

with the grievance committee.[92]  In the letter of complaint, Plaintiff argued that he should not be

punished for refusing to return his food tray, since Sgt. Christopher had not been punished for

withholding his property.[93]  Thus, I find that Plaintiff was given sufficient notice and an

opportunity to be heard for purposes of due process.  As one district judge stated when

dismissing an inmate's due process challenge to the imposition of a *14-day* restricted diet, "§

1983 actions do not exist for the purpose of having the federal courts become involved in minor

restrictions of a prisoner's diet."  *Prewitt v. Coughlin*, 92-CV-4290, 1992 WL 331274, at *1

(S.D.N.Y. Nov. 4, 1992).

As a result, I conclude that Plaintiff has failed to establish a procedural due process claim

with respect to the imposition of a restricted diet.

### E.     Whether Plaintiff Has Established the Personal Involvement of Defendant Burge in any of the Alleged Constitutional Deprivations

A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a

finding of liability in a Section 1983 action.  *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).

Supervisory officials such as prison superintendents are personally involved in a constitutional

violation only if: (1) they directly participated in that violation; (2) they failed to remedy that

violation after learning of it through a report or appeal; (3) they created, or allowed to continue, a

policy or custom under which the violation occurred; (4) they were grossly negligent in managing

subordinates who caused the violation; or (5) they exhibited deliberate indifference to the rights

of inmates by failing to act on information indicating that the violation was occurring.  *Colon v.*

---

[92]      (*See*, *supra*, Statement of Fact Nos. 13-14.)

[93]      (*See*, *supra*, Statement of Fact No. 13.)

*Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (adding fifth prong); *Wright v. Smith*. 21 F.3d 496,

501 (2d Cir. 1994) (adding fifth prong); *Williams v. Smith*, 781 F.2d 319, 323-324 (2d Cir. 1986)

(setting forth four prongs).

Generally, I agree with Defendants' application of the facts to the above legal standard

(Dkt. No. 16, at 14-15 [Defs.' Mem. of Law]), and I reject Plaintiff's application of the facts to

that legal standard (Dkt. No. 21, Part 1, at 24-26). As an initial matter, I note that the primary

forms of personal involvement by Defendant Burge that Plaintiff alleges and/or argues are the

second and fifth forms of personal involvement (described above): i.e., Defendant Burge's failure

to take Plaintiff off the restricted diet after learning of it.[94]  While Plaintiff also argues that

Defendant Burge was grossly negligent in managing subordinates who caused the violation,[95] he

provides absolutely no evidence in support of that conclusory argument, nor can I find any such

evidence.

With respect to the two primary forms of personal involvement alleged by Plaintiff, both

those forms of personal involvement hinge on Defendant Burge's knowledge of the

---

[94]     (Dkt. No. 1, ¶ 15 ["Superintendent Burge, or his designee, was supposed to take
me off the pre-hearing diet. Plaintiff was unlawfully kept on the diet for seven days, without a
Deprivation [sic], or misbehavior report pending a hearing [sic]."], ¶ 19 ["Defendant Burge[]
acted . . . with deliberate indifference to Plaintiff [sic] well-being . . . [a]nd . . . with actual
knowledge that impending harm to plaintiff was easily preventable. Defendant Burge[] failed to
remedy the wrong. Defendant Burge[] had the authority to take Plaintiff off the restricted diet.
However, Plaintiff were [sic] unlawfully kept on the diet for seven days."]; Dkt. No. 21, Part 1 at
24-26 [Plf.'s Mem. of Law, arguing that "Plaintiff wrote defendant Burge[] on March 25, 2003
requesting to be taken off the unlawful restrictive diet. . . . [W]hen Plaintiff complained of the
unlawful diet [Defendant Burge or his designees] should've checked the record and remedied the
wrong."].)

[95]     (Dkt. No. 17, Part 3 at 30 [Plf.'s Mem. of Law, Point III, ¶ 3, citing only to Plf.'s
Exhibits N and K, which do not support Plaintiff's argument].)

constitutional deprivations alleged by Plaintiff.  Plaintiff argues that Defendant Burge became

aware of these constitutional deprivations through Plaintiff's March 25, 2003, letter to him.[96]

(To the extent that Plaintiff argues that Defendant Burge became aware of the constitutional

deprivations through *other* written communications from Plaintiff, Plaintiff does not provide a

citation to the portion of the record that presumably contains such written communications.[97]

The Court has no duty to perform an independent review of the record to find proof of a factual

issue.[98]  However, I have conducted an independent review of the record, and I cannot find any

such written communications during the relevant time period, other than Plaintiff's March 25,

2003, letter.)

        Under the circumstances, I find that no question of fact exists about whether Defendant

Burge was personally involved in the alleged constitutional deprivations; based on the evidence

of record, no reasonable fact-finder could find that he was so personally involved.  As an initial

---

[96]        (*See*, *supra*, Statement of Fact No. 13; Dkt. No. 21, Part 1, at 24-25 [Plf.'s Opp. Mem. of Law, referencing Plf.'s 3/25/03 letter to Def. Burge, but citing only to Plf.'s Exhibits I and W, which do not constitute the letter in question]; Dkt. No. 16, at 14 [Defs.' Mem. of Law].)

[97]        (*See* Dkt. No. 17, Part 3, Point III, ¶ 30 [Plf.'s Mem. of Law, mentioning Plf.'s "complaints" to Def. Burge but not providing record cites to those complaints; citing only to Plf.'s Exhibits K and N, which do not constitute the complaints in question].)

[98]        *See Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

matter, it is unclear how a communication received by Defendant Burge on or after March 25, 2003, could have possibly personally involved Defendant Burge in any constitutional deprivation that had occurred *before* March 25, 2003 (i.e., during the first four days that Plaintiff was on the diet).  Moreover, I find that the letter did not notify Defendant Burge of any violations of the Eighth or Fourteenth Amendments (given the limited factual allegations contained in that letter).[99]  Finally, even if the letter did notify Defendant Burge of any violations of the Eighth or Fourteenth Amendments, I find that, because those violations did not in fact occur (for the reasons stated above in Parts IV.A.-IV.D. of this Report-Recommendation), there were no violations in which Defendant Burge could possibly have participated.

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Burge due to his lack of personal involvement in the alleged constitutional deprivations.

---

[99]     Specifically, the letter informed Defendant Burge only of the following (alleged) facts: (1) the sink in Plaintiff's new cell was (allegedly) "stopped up"; (2) Plaintiff was initially deprived of his "personal and state property" from 6:15 p.m. to 9:45 p.m. on March 20, 2003; (3) he was subsequently deprived of that property by Defendant Christopher, from 9:45 p.m. on March 20, 2003, to 3:00 p.m. on March 21, 2003, because Defendant Christopher stated that Plaintiff had failed to comply with prison procedures when in fact Plaintiff (allegedly) had complied with those procedures, as evidenced by the fact that Plaintiff never received a misbehavior report for any rule violation; and (4) Sergeant Chilson refused to return the property in question despite Plaintiff's requests, because Sergeant Chilson wanted to talk to Defendant Burge first (to see if a deprivation order had been issued).  (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03].)  Noticeably absent from the letter are (1) any allegation that Plaintiff had, during the relevant time period, been experiencing the sort of cold that is necessary to give rise to an Eighth Amendment violation, (2) any allegation that Plaintiff told Defendant Christopher or Sergeant Chilson that he was even the least bit cold, or (3) any allegation that Defendant Christopher had deprived Plaintiff of the property in question without informing Plaintiff of the (purported) reason for the deprivation.  (*Id*.)

**F.     Whether Plaintiff's Claim Against C.O. Myers Should Be Dismissed on Alternative Grounds**

Although Defendants did not raise this issue in their motion papers, an alternative ground exists for dismissing Plaintiff's claim against C.O. Myers.  In his opposition papers, Plaintiff repeatedly states that, "[a]lthough the caption of this matter includes Officer D. Myers, he is not a defendant."[100]  I construe this statement as a request by Plaintiff to voluntary dismiss his claim against C.O. Myers under Rule 41 of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 41(a)(2).  After reviewing the docket sheet in this matter, I find that good cause exists for granting Plaintiff's request: C.O. Myers was never served with process in this action.[101]

I note that it appears that this failure to serve was not the fault of the U.S. Marshal's Service, but the fault of Plaintiff.  Specifically, it appears that Plaintiff failed to properly identify Mr. Myers when he filled out the U.S. Marshal's Service's "Process Receipt and Return" Form, despite this Court's Order directing "Smith [to] comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action."[102]  I further note that Plaintiff's resulting violations of several local and federal rules would constitute additional grounds for dismissing his claim against C.O. Myers.  *See*, *e.g.*, N.D.N.Y. L.R. 4.1(b); Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 16(f).

----

[100]     (Dkt. No. 21, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response]; Dkt. No. 21, Part 1, ¶ 19 [Plf.'s Aff. in Support of Plf.'s Opp. to Defs.' Cross-Mtn. for Summ. Judg.].)

[101]     (Dkt. No. 6 [U.S. Marshal's Service Process Receipt and Return dated 9/18/03, indicating that the DOCS Liaison Officer was unable to locate "Mr. D. Myers, Officer [at Auburn C.F.]" since the Liaison Officer had no record of anyone by that name employed by Auburn C.F.].)

[102]     (Dkt. No. 4 at 4 [Order of 8/19/03, issued by then-M.J. Sharpe].)

As a result, I recommend that, even if there exists no grounds to dismiss Plaintiff's claim against C.O. Myers on the merits, the Court should dismiss Plaintiff's claim against C.O. Myers on procedural grounds.

**ACCORDINGLY**, it is

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 17) be **DENIED**; and it is further

**RECOMMENDED** that Defendants' cross-motion for summary judgment (Dkt. No. 16) be **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Svcs.*, 892 F.2d 15 [2d Cir. 1989]); 28 U.S.C. § 636(b); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: May 5, 2006
      Syracuse, New York

George H. Lowe
United States Magistrate Judge